BETTY BOWERS ᴀɴᴅ HOBART BOWERS
*v.* STATE OF MARYLAND

[No. 101, September Term, 1977.]

*Decided November 10, 1977.*

The cause was argued before ** POWERS, MELVIN and MASON, JJ.

*Harriette Cohen, Assigned Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Ronald Naditch, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

On August 18, 1976, the appellants, Betty Bowers (Betty) and Hobart Bowers (Hobart), were found guilty by a jury in the Circuit Court for Anne Arundel County of violating Maryland's Child Abuse Statute. The convictions arose from

---

** *Reporter's Note:* Powers, J., participated in the hearing of this case and the decision thereof, but retired before the opinion was filed.

an incident that occurred on February 25, 1976, in which Betty's 15 year old daughter, Patricia, was beaten with a belt when Betty and Hobart learned that she had played hookey from school that day. At the same trial, Hobart was also found guilty of raping Patricia on February 23, 1976. Following the trial, the trial court granted Hobart's motion for a new trial as to the rape charge. The trial court then accepted Hobart's guilty plea to a charge of carnal knowledge contained in a separate information filed by the State's Attorney and the rape charge was *nol prossed.* The carnal knowledge charge arose out of the same incident that allegedly occurred on February 23, 1976.

Timely appeals were filed by both appellants from the judgments of conviction of child abuse. No appeal was filed by Hobart from the judgment of conviction of carnal knowledge. Appellants present six questions for our review. Two of the questions relate solely to Hobart's conviction of carnal knowledge. As he took no appeal from that conviction, those questions are not properly before us and we do not consider them. The other four questions will be considered in the order presented.

I

*"Is the Maryland Child Abuse Statute . . .
unconstitutionally vague and indefinite?"*

The statute under consideration is codified in the Maryland Code (1976 repl. vol.) as § 35A of Article 27. In relevant part it provides as follows:

> "(a) *Penalty.* — Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years who causes abuse to such minor child shall be guilty of a felony and upon conviction shall be sentenced to not more than fifteen years in the penitentiary.

(b) *Definitions.* — Wherever used in this section, unless the context clearly indicates otherwise:

\* \* \*

7. *'Abuse'* shall mean any: (A) physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for supervision of a minor child . . . . "

(a)

Both appellants contend that the words "cruel or inhumane treatment" contained in the definition of "abuse" are not sufficiently definite to define the conduct proscribed, and that "those terms have a wide range of [dictionary] meanings and that men of common intelligence could clearly differ as to what sort of conduct falls within the various meanings . . . . "

The test for determining whether a statute is so vague as to be unconstitutional under the due process clause has been set out by this Court in *Lashley v. State*, 10 Md. App. 136, 142, 268 A. 2d 502 (1907), *cert. denied*, 259 Md. 733 (1970), *appeal dismissed*, 402 U. S. 991 (1971), wherein Chief Judge Murphy (now Chief Judge of the Court of Appeals) said:

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed of what State law commands or forbids; consequently, a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,

violates the first essential of due process of law. *Lanzetta v. New Jersey*, 306 U. S. 451; *Connally v. General Construction Co.*, 269 U. S. 385."

While it is settled that a "reasonable degree of certainty in legislation" is required, it is equally well settled that, as we said in *Bacheller v. State*, 3 Md. App. 626, 632, 240 A. 2d 623 (1968), "[t]he formulation of statutory language is, at best, an inexact exercise vulnerable to varying degrees of doubt and ambiguity". As the Court of Appeals said in *State v. Magaha*, 182 Md. 122, 32 A. 2d 477 (1943):

"It is desirable, of course, that penal statutes and ordinances should be expressed in language as specific as the subject matter will permit, but it is obviously impossible to define some types of crime by a detailed description of all possible cases that may arise. The prohibited act may be characterized by a general term without definition, if the term has a settled common-law meaning and a commonly understood meaning which does not leave a person of ordinary intelligence in doubt as to its purport, even though there may be in the definition of the term an element of degree as to which estimates of reasonable men might differ." 182 Md. at 129-130.

Consonant with these principles is the following language of the Supreme Court in *Jordan v. De George*, 341 U. S. 223, 231 (1951):

"We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. *United States v. Wurzbach*, 280 U. S. 396, 399 (1930). Impossible standards of specificity are not required. *United States v. Petrillo*, 332 U. S. 1 (1947). The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices. *Connally v. General Construction Co.,* 269 U. S. 385 (1926)."

Applying the above principles to the case at hand we hold that the terms "cruel or inhumane treatment" in the context of the statute as a whole are not so vague and indefinite as to render the statute void for vagueness. Each term has "a settled common-law meaning and a commonly understood meaning which does not leave a person of ordinary intelligence in doubt as to its purport, even though there may be in the definition of the term an element of degree as to which estimates of reasonable men might differ." *State v. Magaha, supra.*

In *State v. Fabritz,* 276 Md. 416, 348 A. 2d 275 (1975), the Court of Appeals construed the statute, as amended in 1973, as reflecting the legislative intent to broaden the area of proscribed conduct in child abuse cases. In *Fabritz,* the Court held that where a mother's failure to obtain medical assistance for her child, known by the mother to have been severely beaten by another, caused the child to sustain bodily injury additional to and beyond that inflicted upon the child when originally assaulted, the evidence was sufficient under the circumstances to permit a conviction under the statute. The Court said:

> " . . . [I]n these circumstances Virginia's treatment of Windy was 'cruel or inhumane' within the meaning of the statute and *as those terms are commonly understood.*" (Emphasis added.) *Id.* at 426.

Thus, although the constitutionality of the statute was not an issue in *Fabritz,* we regard the above quoted statement by the Court as authority for the proposition that the terms "cruel or inhumane treatment" as used in the statute do indeed have a commonly understood meaning. Their use to describe the forbidden conduct does not, therefore, render the statute void for vagueness. *Jordan v. De George, State v. Magaha,* both *supra.* Our conclusion in this regard is

fortified by decisions in other jurisdictions where similarly or even more vaguely worded child abuse statutes have survived void-for-vagueness attacks. *See, e.g., State v. Fahy,* 201 Kan. 366, 440 P. 2d 566 (" ... [S]uch words as torture, beat, abuse, *cruel punishment or inhuman punishment are hardly vague"*. (Emphasis supplied)); *Campbell v. State,* 240 So. 2d 298 (Fla.) ("unnecessarily or excessively chastises"); *People v. Curtiss,* 116 Cal. App. Supp. 771, 300 P. 801 ("unjustifiable" treatment of child); *Hunter v. State,* 360 N.E.2d 588 (Indiana) ("unnecessary" punishment or infliction of pain).

### (b)

As part of their void-for-vagueness argument, appellants further contend that the statute "does not clearly define or name the class of persons to whom it applies". By its terms the statute applies to, "Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child . . . . " This language is sufficiently explicit, we think, to inform a person of ordinary intelligence whether or not he comes within the class of persons against whom the statute is directed, and this is enough to defeat a claim of unconstitutional vagueness.

Appellants in their brief suggest, "An argument could be made that the language is so broad that it would apply to a babysitter, as well as to a 16 year old boy on a date with a 15 year old girl." To this argument we find apposite what was stated by the Supreme Court of Illinois in *People v. Vandiver, supra* at 683:

> "To support his contention that the statute is vague the defendant poses several questions such as: 'Would a parent be violating the statute if he permitted his child to play in a busy street or to take part in sports such as boxing or mountain climbing, etc.?' We need not be concerned with the hypothetical situations posed by the defendant or the many other situations which may present

questions as to the applicability of the statute. These borderline facts are not involved in this case. This court will consider the validity of a statutory provision only at the instance of one who is directly involved thereby unless the unconstitutional feature is so pervasive as to render the entire act invalid. (*People v. Reiner*, 6 Ill. 2d 337, 341, 129 N.E.2d 159; *Huckaba v. Cox*, 14 Ill. 2d 126, 150 N.E.2d 832; *Edelen v. Hogsett*, 44 Ill. 2d 215, 254 N.E.2d 435.) The hypothetical situations do not involve this defendant nor this case and the validity of the statute in light of the same will therefore not be considered."

In summary, we hold that the Maryland Child Abuse Statute is not unconstitutional for the reasons assigned by the appellants.

## II

*"Was the evidence insufficient to convict Appellant, Betty Bowers, of child abuse? "*

At the conclusion of all the testimony, the trial judge denied Betty's motion for judgment of acquittal. On appeal Betty contends the ruling was in error. After a careful review of the record, viewed in the light most favorable to the State, we agree with her contention. To help explain our conclusion, we briefly summarize the evidence as follows. Prior to February 25, 1976, Betty and Hobart had lived together as man and wife without benefit of marriage for some twelve years. Patricia, Betty's daughter by another man, was about five years old when Hobart came to live with her and her mother. On February 25, 1976, Patricia, who was then fifteen years old, played hookey from school for part of the day, spending the time with a boyfriend on a parking lot "getting high" on drugs. This was not the first time she had skipped school. As a disciplinary measure for the prior occasions Patricia had been denied "telephone

privileges". On February 25, 1976, when Betty returned home from work and learned that Patricia had again skipped school, she struck Patricia "two or three" times on the legs with a leather belt. Patricia described the incident as follows:

"Q. Can you describe how she hit you, I mean, did she hit you like this, a little tap, did she move her arm all the way back or partially back?

A. Yes, she moved her arm back like that to hit me.

Q. Did it hurt?

A. Not really.

Q. Where was Mr. Bowers?

A. Standing there watching.

Q. What was your mother saying to you as she hit you?

A. She was saying to me 'now, when you go back to school you're going to go to school, aren't you? I says 'yes', she said 'you're not going to hook any more classes, are you', and I said 'no'. And then he — my stepfather said 'let me have the belt now', and he took it and he began to hit me."

Patricia further testified that Hobart then proceeded to strike her with the belt about her back, neck, arms and legs. He hit her "around fifteen — twenty times".

The State does not contend that Betty's actions in striking her daughter "two or three" times was, under the circumstances, "cruel or inhumane". Rather, it is argued that Betty is guilty as a principal because by giving up the belt to Hobart she "instigated or encouraged" the brutal attack that followed and did nothing to stop it. The evidence does not support the argument. Patricia, the State's principal witness, testified that although her mother did not physically attempt to restrain Hobart, she twice told him to stop "after she seen he was really going to hurt me". Moreover, there is no evidence to show that Betty could have

reasonably foreseen that Hobart would beat Patricia as severely as he did.

> "Under the common law, parties to a felony are classified as principals or accessories. Principals in the first degree are those who commit the deed as perpetrating actors, either by their own hand or by the hand of an innocent agent. Persons present, actually or constructively, aiding and abetting the commission of the crime, but not themselves committing it, are principals in the second degree . . . . But in this State there is no practical distinction between principals in the first and second degree." *Butina v. State,* 4 Md. App. 312, 318, 242 A. 2d 819 (1968).

In the circumstances, we think the evidence was legally insufficient to enable the jury to find beyond a reasonable doubt that Betty, though present at the time, aided or abetted Hobart in his "cruel or inhumane treatment" of Patricia. As we said in *Coleman v. State,* 4 Md. App. 386, 390, 243 A. 2d 24 (1968):

> "It is well settled that the presence of the accused at the immediate and exact spot where a crime is in the process of being committed is a very important element that may be considered in determining guilt. *Equally well settled is the proposition that such presence, standing alone, is insufficient to establish participation in the perpetration of the crime . . . .* " (Emphasis supplied.)

As Betty's motion for judgment of acquittal was wrongfully denied, her conviction will be reversed.

### III

*"Was the evidence insufficient to convict Appellant, Hobart Bowers, of child abuse? "*

On this issue Hobart does not contend that his actions toward Patricia do not fall within the conduct proscribed by

Article 27, § 35A. His sole contention here is that "the State failed to prove that he had a parental or custodial relationship to Patricia sufficient to bring him within the definition of Sec. 35A". He points to the fact that although he had lived with Patricia and Betty since 1964, he had no "legal" relationship to either of them on February 25, 1976, the date he beat Patricia,[1] and contends that his "official status was simply that of Betty's paramour". At the same time, however, he concedes that the statute was meant to encompass, at least, those who have "quasi-parental authority, *i.e.*, those who stand *in loco parentis* to the minor".

Without attempting to define the limits of all relationships that may exist to bring one within the statute's application, we agree with the appellant that the proscriptions of the statute do apply to one who stands *in loco parentis* to the minor who is abused.

> "A person is said to stand in loco parentis when he puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to a legal adoption. Some definitions add that he must discharge those obligations, as well as assume them . . . ."

> "The relationship of in loco parentis is established only when the person intends to assume toward the child the status of a parent. It has been said that when a person takes a child not his own into his custody as a member of his own family, this constitutes the clearest evidence of consent to stand in loco parentis. However, it has been held that the fact that a child was part of a man's household and received its support entirely from him is not enough to establish an in loco parentis

---

**1.** Betty and Hobart were married approximately one month before the trial below.

relationship; it must also be shown that the man intended to assume parental responsibility. The assumption of the parental relationship is largely a question of intention, which, it has been said, should not be lightly or hastily inferred, but which may be shown by the acts and declaration of the person alleged to stand in that relation. *Its existence is normally a factual question, to be determined on the trial.*" (Emphasis added.) 59 Am. Jur. 2d *Parent and Child,* § 88.

There is evidence in the case that Hobart lived with Betty on a continuous basis as husband and wife for at least ten years; that during that time he regarded Patricia as part of "my family"; that he "accept[ed]" her "like one of . . . [his] own children"; that he "provided" for her and had undertaken to discipline her on prior occasions (though not with the severity of the February 25th incident). We think this evidence and the inferences that may be drawn therefrom were clearly sufficient to permit the jury to find beyond a reasonable doubt that at the time Hobart beat Patricia he was *in loco parentis* to her. The trial judge was correct in denying his motion for judgment of acquittal.

## IV

*"Did the trial court err in allowing the State during rebuttal to produce extrinsic evidence solely for the purpose of impeachment?"*

The short answer to this issue is that it is not properly before us for review. The record does not reflect that the appellants made any objection below to the *question* that elicited the now challenged evidence. Nor was there any motion to strike such evidence. We therefore do not consider its admissibility. Md. Rule 1085; *Lohss v. State,* 272 Md. 113, 321 A. 2d 534 (1974). We would add that were the question

properly before us we would hold the error, if any, in admitting the testimony was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A. 2d 665 (1976).

> *Judgment of conviction against Betty Bowers under Indictment No. 18,365 reversed.*
>
> *Judgment of conviction against Hobart Bowers under Indictment No. 18,366 affirmed.*
>
> *Costs to be paid one-half by Hobart Bowers and one-half by Anne Arundel County.*